1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nicholas R. Farnolo, Esq. (Admitted *Pro Hac Vice*)
**NAPOLI SHKOLNIK, PLLC**
400 Continental Boulevard, 6th Floor
El Segundo, CA 90245
T: (212) 397-1000
F: (646) 843-7619
NFarnolo@napolilaw.com

*Attorneys for Plaintiff*
*Rocky Point Union Free School District*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCKY POINT UNION FREE SCHOOL DISTRICT, SUFFOLK COUNTY, NEW YORK | CASE NO.: |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL:** |
| v. | Public Nuisance |
| JUUL LABS, INC.; ALTRIA GROUP, INC.; ALTRIA CLIENT SERVICES, LLC; ALTRIA GROUP DISTRIBUTION COMPANY; NU MARK, LLC; PHILIP MORRIS USA, INC.; and JOHN DOES 1-100, INCLUSIVE, | Strict Liability – Design Defect Strict Liability – Failure to Warn Negligence Gross Negligence |
| Defendants. | |

COMES NOW, Plaintiff Rocky Point Union Free School District, Suffolk County, New York ("Plaintiff" or "Rocky Point UFSD"), by and through its attorneys, hereby brings the following complaint for damages against defendant Juul Labs, Inc., f/k/a PAX Labs, Inc., (collectively, "JUUL"), Altria Group, Inc., Altria Client Services, LLC, Altria Group Distribution Company (collectively "Altria Defendants"), Nu Mark LLC, Philip Morris USA, Inc. and John Does 1-100 and their conduct in the marketing, distribution, and sale of e-cigarettes to minors. Plaintiff brings this action arising out of the injuries to its property, students, and employees cause by Defendants' wrongful conduct. Plaintiff alleges the following upon personal knowledge as to itself

1

and its own acts and upon information and belief as to all other matters based on the investigation of counsel.

## INTRODUCTION

1.      One of the great public health success stories over the past decade has been a reduction in youth tobacco use and in nicotine addiction. Youth smoking rates plummeted from 28% in 2000 to 7.6% in 2017.[1] This success has been the result of years of litigation and strict regulation. It is also due to a public health message that Big Tobacco can no longer dispute or contradict, and which is simple, stark, and effective: smoking kills.

2.      This incredible progress towards eliminating youth tobacco use has now largely been reversed due to JUUL's e-cigarette products and vaping. Between 2011 and 2015, e-cigarette use among high school and middle school students increased 900%.[2] Between 2017 and 2018, e-cigarette use increased 78% among high school students, from 11.7% of high school students in 2017 to 20.8% of high schoolers in 2018.[3] Among middle school students, e-cigarette use increased 48% between 2017 and 2018.[4] In 2018, 4.9 million middle and high school students used tobacco products, with 3.6 million of those students using e-cigarettes.[5] Between 2017 and 2018, the number of youth e-cigarette users increased by 1.5 million.[6]

---

[1] Meredith Berkman, Testimony of Meredith Berkman, Parents Against Vaping E-cigarettes, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20BerkmanPAVe%20Testimony.pdf.
[2] Jerome Adams, Surgeon General's Advisory on E-cigarette Use Among Youth, Ctrs. for Disease Control & Prevention (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-ecigarette-use-among-youth-2018.pdf.
[3] *Id.*
[4] 2018 NYTS Data: A startling rise in youth e-cigarette use, U.S. Food & Drug Admin. (Feb. 2, 2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/2018-nyts-data-startling-rise-youth-e-cigarette-use.
[5] *Id.*
[6] *Id.*

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

3.      Consistent with this trend, students in Rocky Point Union Free School District are vaping at high rates, which continue to climb. Rocky Point UFSD has seen a dramatic increase in student vaping.

4.      According to the Centers for Disease Control and Prevention ("CDC") Director Robert Redfield, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[7] The U.S. Food and Drug Administration ("FDA") Commissioner Scott Gottlieb described the statistics related to youth vaping as "astonishing" and both the FDA and the U.S. Surgeon General have appropriately characterized youth vaping as an "epidemic."[8] The National Institute on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance recorded in 44 years, and the Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[9]

5.      A major cause of this epidemic is JUUL Labs, Inc., the maker of the JUUL e-cigarette. JUUL entered the e-cigarette market in 2015 and now controls over 70% of it.[10] Over a

---

[7] Texas governor signs law increasing the age to buy tobacco products to 21, CNN (June 8, 2019), https://m.cnn.com/en/article/h_b4cf0b92fd821251a4ae48df9b717145.

[8] Angelica LaVito, FDA chief Gottlieb threatens to pull e-cigarettes off market if 'astonishing' surge in teen use doesn't slow, CNBC (Nov. 16, 2018), https://www.cnbc.com/2018/11/16/fda-chief-gottlieb-threatens-to-pull-e-cigarettes-off-market.html; Jayne O'Donnell, FDA declares youth vaping an epidemic, announces investigation, new enforcement, USA Today (Sept. 12, 2018), https://www.usatoday.com/story/news/politics/2018/09/12/fdascott-gottlieb-youth-vaping-e-cigarettes-epidemic-enforcement/1266923002/.

[9] Jan Hoffman, Study Shows Big Rise in Teen Vaping This Year, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens.

[10] Richard Craver, Juul ends 2018 with 76 percent market share, Winston-Salem J. (Jan. 8, 2019), https://www.journalnow.com/business/juul-ends-with-percent-market-share/article_6f50f427-19ec-50be-8b0c-d3df18d08759.html.

million JUUL e-cigarettes were sold between 2015 and 2017.[11] In 2017, JUUL generated over $224 million in retail sales, a 621% year-over-year increase.[12] By June 2018, sales had skyrocketed another 783%, reaching $942.6 million.[13] The e-cigarette category as a whole grew 97% to $1.96 billion in the same period, largely based on JUUL's market success.[14] JUUL's dominance of the e-cigarette market has been so rapid, and so complete, that the act of vaping is now often referred to as "juuling."

6.     JUUL's market dominance has attracted the attention of government regulators, including the FDA. On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of its products among youth and demanding that JUUL produce documents regarding its marketing practices.[15] On September 12, 2018, the FDA sent letters to JUUL and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[16] In October 2018, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to JUUL's sales and marketing practices.[17] As of October 2019, the FDA, the Federal Trade Commission, multiple state attorneys general, and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into

---

[11] Melia Robinson, How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year, Bus. Insider (Nov. 21, 2017), https://www.businessinsider.my/juul-e-cigarette-one-million-units-sold-2017-11/.

[12] Id.

[13] Angelica LaVito, Popular e-cigarette Juul's sales have surged almost 800 percent over the past year, CNBC Health & Sci. (Sept. 11, 2018), https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-the-past-year.html.

[14] Id.

[15] Matthew Holman, Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc., U.S. Food & Drug Admin. (Apr. 14, 2018), https://www.fda.gov/media/112339/download .

[16] Letter From US FDA to Kevin Burns, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[17] Laurie McGinley, FDA seizes Juul e-cigarette documents in surprise inspection of headquarters, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documentssurprise-inspection-headquarters/.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

JUUL's role in the youth vaping epidemic and whether JUUL's marketing practices purposefully targeted youth.

7.      JUUL now insists it never marketed to young people. This assertion is patently false. JUUL has compelled a generation of youth, who were never cigarette smokers, into nicotine addiction and put them at risk for severe lung injury and/or other health harms resulting from aerosol inhalation. JUUL is working to maintain JUUL's record-breaking sales and market dominance— which would not be possible if the customer base was truly only adults looking to quit smoking, or for a purported healthier alternative to smoking.

8.      In fact, JUUL does not have a legitimate basis to claim that its product is healthier than cigarettes. On September 9, 2019, the FDA warned JUUL that it has violated federal law by making unauthorized representations that JUUL products are safer than cigarettes.[18]

9.      Rocky Point UFSD has already taken actions to reduce tobacco use among its students—but now it must address the new epidemic of youth vaping. Serving a population of nearly 2,792 students and 422 staff, Rocky Point UFSD experiences the dangers of vaping, firsthand. Rocky Point UFSD school nurses have seen an increase in student health issues connected to vaping, including but not limited to dizziness and syncope, shortness of breath, rapid heartrate, and nausea and vomiting. Rocky Point UFSD has had to divert resources in an ongoing effort to educate students of the consequences of using vaping products and continues to address the epidemic on a daily basis.

---

[18] Juul Labs, Inc. Warning Letter, U.S. Food and Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspectionscompliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## PARTIES

10.     Plaintiff Rocky Point Union Free School District is comprised of four schools: Frank J. Carasiti Elementary School (KG-2); Joseph A. Edgar Intermediate School (3-5); Rocky Point Middle School (6-8) and Rocky Point High School (9-12). Enrollment includes approximately 2,792 students.  Plaintiff's mission is to develop each child's full potential in a nurturing and supportive student-centered environment that will promote a foundation for lifelong learning. Plaintiff's administrative offices are located at 90 Rocky Point-Yaphank Road, Rocky Point, NY 11778.

11.     Defendant JUUL Labs, Inc., f/k/a PAX Labs, Inc. is a Delaware corporation. Its principal place of business is in San Francisco, California. JUUL manufacturers, designs, sells, markets, promotes, and distributes JUUL e-cigarettes, JUULpods and accessories.

12.     PAX Labs, Inc., is a Delaware Corporation. Its principal place of business is in San Francisco, California. PAX Labs, Inc.'s current website says it was founded in 2007. For much of the relevant time period and until at least 2017, PAX Labs, Inc. and JUUL operated as the same company. During that time, JUUL manufactured, designed, sold, marketed, promoted, and distributed JUUL e-cigarettes, JUULpods, and accessories as a part of PAX Labs, Inc.

13.     Defendant Altria Group, Inc. is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products. On December 20, 2018, Altria purchased a 35% stake in JUUL.

14.     Defendant Altria Client Services LLC. is a Virginia LLC and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Client Services LLC provides Altria Group, Inc. and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and

safety, health, and environmental affairs. On September 25, 2019, the former senior vice president and chief growth officer of Altria Client Services LLC, K.C. Crosthwaite, became the new chief executive of JUUL.

15.     Defendant Altria Group Distribution Company is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Group Distribution Company provides sales, distribution, and consumer engagement services to Altria's tobacco companies.

16.     Defendant Nu Mark LLC is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc., with its principal place of business in Richmond, Virginia. Nu Mark LLC was engaged in the manufacture and sale of Altria's electronic vapor products. Shortly before Altria purchased a 35% stake in JUUL in December 2018, Altria Group, Inc. announced that Nu Mark LLC would be discontinuing the production and sale of all e-vapor products.

17.     Defendant, Philip Morris USA, Inc. (Philip Morris), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

18.     The Plaintiff presently lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate, or otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100 inclusive. The Plaintiff will amend this Complaint to show their true names and capacities if and when they are ascertained. The Plaintiff is informed and believes, and on such information and belief alleges, that each of the Defendants names as a

DOE is responsible in some manner for the events and occurrences alleges in this Complaint and is liable for the relief sough herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff and Defendant are citizens of different states.

20.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

21.     This court has personal jurisdiction over Defendant because it does business in this District and has sufficient minimum contacts with this District. Defendant intentionally avails itself of the markets through the promotion, marketing, and sale of the products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under California law and the United States Constitution.  Furthermore, a substantial part of the events giving rise to the claims occurred in this judicial district.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.  Following Big Tobacco's lead

23.     JUUL was founded by Adam Bowen and James Monsees. The company's beginnings can be traced to the pair's collaboration on a product design master's thesis when they were graduate students at Stanford University in 2004—Monsees completing a Master of Fine Arts

in Product Design, and Bowen a Master of Science in Mechanical Engineering in Product Design.[19] Their proposed product? A better cigarette.

24.     Monsees has described the cigarette as "the most successful consumer product of all time. . . an amazing product."[20] But years of anti-smoking campaigns have successfully denormalized cigarette smoking. As part of their product design research, Monsees and Bowen interviewed smokers who talked about feeling self-conscious of the signs of smoking, for example, coming back into a room after a smoke break and smelling like smoke, or having their hands smell like cigarettes even after washing them multiple times.[21] They ended their presentation with a clip from an episode of South Park, a satirical cartoon, showing the characters assembled at the Museum of Tolerance and shaming a smoker.[22] Monsees and Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category" and recreate the lost "ritual and elegance that smoking once exemplified."[23]

25.     Essentially, Monsees and Bowen saw a market opportunity in a generation of consumers brought up on anti-smoking norms. In Monsees' words, they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[24] Monsees saw "a huge opportunity for

---

[19] Allison Keeley, Vice Made Nice?, Stanford Mag., (Aug. 2012), https://stanfordmag.org/contents/vice-made-nice .

[20] Gabriel Montoya, Pax Labs: Origins with James Monsees, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Sept. 7, 2019).

[21] Jordan Crook, This is the Stanford thesis presentation that launched Juul, Tech Crunch (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.

[22] Id.

[23] Onboardly Interview with Ploom Cofounder and CEO James Monsees, Pax.com (Apr. 30, 2014), https://www.pax.com/blogs/press/onboardly.

[24] Id.

9

products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[25]

26.     At one point during their thesis presentation, Monsees states: "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[26] This description applies just as well to the product he and Bowen would launch a decade later—JUUL.

27.     The outcome of Monsees and Bowen's thesis project was a "heat-not-burn" e-cigarette, which uses loose-leaf tobacco. The device heated tobacco contained in pods to a constant temperature, vaporizing nicotine and flavor without burning the materials or producing smoke.

28.     After graduation, Bowen and Monsees worked on bringing their thesis project to the market, incorporating under the name Ploom in 2007. In those early years, they spent a lot of time talking about what Bowen called "the kind of typical thoughts of evil Big Tobacco companies like coming down and squashing you."[27] But ultimately, that "was not really an issue."[28] In fact, not only did Big Tobacco not squash them, but the opposite. Although Bowen and Monsees characterized their products as aimed toward consumers not aligned with traditional tobacco products, they themselves have aligned with Big Tobacco on at least two occasions: first, with Japan Tobacco and then with JUUL.

29.     In 2010, Ploom launched its e-cigarette as the ModelOne, using pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand units. By then a

---

[25] *Id.*
[26] *See supra* note 20
[27] Keeley, *supra* note 19.
[28] *Id.*

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[29]

30.     Help came from Japan Tobacco International ("JTI"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, JTI and Ploom entered into a strategic agreement, which gave JTI a minority stake in Ploom and made it a strategic partner. In a statement regarding the agreement, Monsees said, "We are very pleased to partner with JTI as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."[30] As Bowen explained in an interview, "[w]e were still doing a lot of our own internal product development, but now we had access to floors of scientists at JTI."

31.     In 2012, Ploom unveiled the PAX, a loose-leaf vaporizer that did not use pods, but which was much more successful. The following year, Ploom combined elements of the PAX with the pod system as the ModelTwo. Although consumers were enthusiastic about both the PAX and the ModelTwo, the products were limited to a small, high-end market. The PAX, for example, retailed for $250 when it was first marketed. But, as one of Ploom's investors remarked in 2014, "[t]he company is going to invade the bigger, lower-end market now dominated by e-cigarettes." He explained that Ploom had "lots of products in the works" and that "we know we need something cheaper than PAX to go after the mass market. There are still huge opportunities out there."[31]

---

[29] David H. Freedman, How Do You Sell a Product When You Can't Really Say What It Does?, Inc.com, http://area51.thedct.net/project102-startupdhaka/business/how-do-you-sell-a-product-when-you-cant-really-say-what-it-does/  (accessed Sep.  20, 2021).
[30] Innovative Partnership for Ploom and Japan Tobacco International JTI to Take Minority Share in Ploom, Japan  Tobacco  Int'l,  https://www.jti.com/our-views/newsroom/innovative-partnership-ploom-and-japan-tobacco-international-jti-take-minority  (accessed Sep. 20, 2021).
[31] Freedman, supra note 29.

11

32.     In February 2015, Ploom and JTI ended their relationship, with Ploom buying back JTI's minority stake in the business. JTI acquired the ModelTwo and pods product line, as well as the Ploom name, while Ploom kept its open-system PAX vaporizer and changed its name to PAX Labs Inc. Monsees characterized the partnership as having "afforded both parties many mutual benefits," but said that the new arrangement would "fuel continued growth" and that PAX intended "rapid rollouts of new products."[32]

33.     PAX made good on its promise of new products and invading the bigger, lower-end market. As discussed further below, PAX launched the JUUL in June 2015 with a well-publicized launch party in New York City and a viral social media marketing campaign.

34.     The company renamed itself JUUL Labs, Inc. in 2017.

35.     By the close of 2017, according to Nielsen data, JUUL had surpassed its competitors in capturing 32.9 percent of the e-cigarette market. The total e-cigarette market itself expanded 40 percent to $1.16 billion.[33]

36.     In 2018, JUUL's gross profit margins were 70%[34] and it represented 76.1% of the national e-cigarette market.[35] In a complaint it filed in November 2018 against 24 vape companies

---

[32] JTI to Acquire Ploom Product Line, Convenient Store News (Feb. 16, 2015), https://csnews.com/jti-acquire-ploom-product-line.

[33] Ari Levy, E-cigarette maker Juul is raising $150 million after spinning out of vaping company, CNBC (Dec. 19, 2017), https://www.cnbc.com/2017/12/19/juul-labs-raising-150-million-in-debt-after-spinning-out-of-pax.html.

[34] Dan Primack, Scoop: The Numbers Behind Juul's Investor Appeal, Axios (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee5da64e3e2f82.html.

[35] Robert K. Jackler et al., JUUL Advertising Over Its First Three Years on the Market 2, Stanford Res. into the Impact of Tobacco Advert. (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf

for alleged patent infringement, JUUL asserted that it was "now responsible for over 95% of the growth in the ENDS pod refill market in the United States" and included the following chart:[36]

### Appendix 5: U.S. ENDS Pod Market Retail Unit Sales Growth 2018
#### 4-Week Unit Sales by End Date

|  | Nielsen | | | IRI | | |
|---|---|---|---|---|---|---|
|  | Apr 21 | Sep 8 | Share of Growth | Apr 22 | Sep 9 | Share of Growth |
| Total Market | 36,002,645 | 55,773,039 | 100% | 29,546,883 | 50,793,955 | 100% |
| Juul | 22,618,886 | 41,501,272 | 95.5% | 14,964,158 | 35,166,120 | 95.1% |
| Vuse | 6,385,922 | 6,172,595 | -1.1% | 7,204,900 | 7,409,312 | 1.0% |
| MarkTen | 3,677,300 | 4,240,285 | 2.8% | 2,904,168 | 3,230,237 | 1.5% |
| Logic | 1,785,167 | 2,018,023 | 1.2% | 1,928,841 | 1,876,006 | -0.2% |
| Blu | 1,062,360 | 1,461,127 | 2.0% | 1,305,209 | 1,937,225 | 3.0% |
| Other | 473,010 | 379,837 | -0.5% | 1,239,607 | 1,175,055 | -0.3% |

37.     JUUL shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months—four times faster than Facebook.[37] This all came just three years after its product launch.

38.     JUUL's staggering commercial success did not come from a blank slate. Under the Master Settlement Agreement between Big Tobacco and the States, the public has access to hundreds of thousands of Big Tobacco's internal documents. In creating JUUL, Monsees and Bowen carefully studied the marketing strategies, advertisements, and product design of Big Tobacco. As Monsees candidly acknowledged, the internal tobacco documents "became a very intriguing space for us to investigate because we had so much information that you wouldn't

---

[36] Verified Complaint Under Section 337 of the Tariff Act of 1930 at 6, In the Matter of Certain Cartridges for Elec. Nicotine Delivery Sys. & Components Thereof, Investigation No. 337-TA-1141 (USITC Nov. 19, 2018).
[37] Zack Guzman, Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status, Yahoo! Fin. (Oct. 9, 2019), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html.

normally be able to get in most industries. And we were able to catch-up, right, to a huge, huge industry in no time. And then we started building prototypes."[38]

39.     Monsees and Bowen reviewed documents in the Big Tobacco archive that included information on how to manipulate nicotine pH to maximize nicotine delivery in a vapor while minimizing the "throat hit" that may potentially deter new smokers. Other records related to tobacco industry market strategies and advertisements designed to lure non-smoking youth. Monsees and Bowen were able to take advantage of an extensive online tobacco advertising research database maintained by the Stanford Research into the Impact of Tobacco Advertising ("SRITA"), an inter-disciplinary research group devoted to researching the promotional activities of the tobacco industry. SRITA's database contains approximately 50,000 original tobacco advertisements. According to Monsees, JUUL's advertising was informed by traditional tobacco advertisements, and SRITA in particular had been very useful to JUUL.[39]

40.     It is no secret that a good portion of the Big Tobacco playbook involved targeting youth. Beginning in the 1950s, JUUL's now corporate affiliate, Philip Morris, intentionally marketed cigarettes to young people under the age of 21 to recruit "replacement smokers" to ensure the economic future of the tobacco industry.[40] Philip Morris knew that youth smoking was essential to the tobacco industry's success and longevity, as an internal Philip Morris document makes clear: "It is important to know as much as possible about teenage smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[41] For this reason tobacco companies focused on the 14-

---

[38] Montoya, supra note 20.
[39] Jackler et al., supra note 35 at 27.
[40] Amended Final Opinion at 972, U.S. v. Philip Morris, No. 99-cv-2496 (D.D.C. Aug. 17, 2006), ECF 5750.
[41] Tobacco Company Quotes on Marketing to Kids, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

24 year-old age group, because "young smokers have been the critical factor in the growth" of tobacco companies and the 14-18 year-old group is an increasing segment of the smoking population.[42] As the Vice-President of Marketing at R.J. Reynolds Tobacco Company ("RJR") explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years."[43]

41.     Big Tobacco is now prohibited from employing these tactics and strategies to market traditional cigarettes. Nothing prevented JUUL from doing so.

42.     Restrained from its historical playbook, Big Tobacco has looked for opportunities for growth in the e-cigarette market. In December 2018, Altria, the maker of Marlboro cigarettes and a Tobacco giant, took a 35% stake in JUUL and invested billions into the company. Seeing JUUL as a proven gateway to other substances, including cigarettes, Altria saw an opportunity to expand JUUL's market share and grow the e-cigarette market in the hopes of ultimately driving more cigarette and tobacco use and nicotine addiction. Altria could use JUUL to circumvent the regulatory and legal restrictions on Big Tobacco's marketing tactics.

**B.  JUUL targeted kids**

43.     Because of Big Tobacco's demonstrated effectiveness at addicting youth to nicotine, cigarette manufacturers operate under tight restrictions regarding their advertising and marketing activities. By way of example, cigarette companies may not:

    a.  Use outdoor advertising such as billboards;
    b.  Sponsor events;
    c.  Give free samples;

---

[42] *Id.*

[43] C.A. Tucker, Marketing Plans Presentation to RJRI B of D, Truth Tobacco Industry Documents, U. of S.F. (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.

d. Pay any person to use, display, make reference to or use as a prop any tobacco product, tobacco product package in any media;

e. Pay any third party to conduct any activity which the tobacco manufacturer is prohibited from doing; or

f. Sell "flavored" cigarettes.

44.     All of these above activities were prohibited because of their effectiveness at appealing to youth. As described below, all of these activities figured prominently in JUUL's marketing campaign.

45.     According to Dr. Robert Jackler, an otolaryngologist and professor at Stanford University School of Medicine and principal investigator for SRITA, JUUL's initial marketing was "patently youth oriented."[44] JUUL's 2015 ad campaign, called "Vaporized" was designed to create a "cult-like following."[45] Its imagery featured a vivid color scheme and models in their twenties in poses that researchers note are evocative of behaviors more characteristic of underage teens than mature adults.[46] Dr. Jackler and his colleagues found it "clear" that this imagery resonated with underage teens who aspire to emulate trendsetting young adults.[47]

46.     Tobacco advertisers have long understood that teens are attracted to such imagery. The Vaporized campaign was featured on the front page of VICE magazine, "the #1 youth media company in the world."[48] In the summer of 2015, an animated series of Vaporized billboards, with the campaign's youth-appealing imagery, were displayed in New York's Times Square.[49]

---

[44] Robert K. Jackler, The Role of the Company in the Juul Teen Epidemic, Testimony of Robert Jackler before the House Subcommittee on Economic and Consumer Policy (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Jackler%20Testimony.pdf at 2 ("Jackler Testimony").
[45] Id. at 4.
[46] Jackler et al., supra note 35.
[47] Id. at 7.
[48] Id. at 5.
[49] Id. at 17-18.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**



47.     Over the first year after JUUL launched its ad campaign in June 2015, it held a series of at least 50 highly stylized parties, typically with music entertainment, in cities across the United States.[50] Thousands of young people were given free nicotine-filled JUULpods (appropriately named "JUUL starter kits"), and JUUL posted photos of various young people enthusiastically puffing on JUULs across their social media channels.[51] JUUL advertising also featured popular stars such as Katy Perry holding a JUUL at the Golden Globes.[52]

THIS SPACE INTENTIONALLY LEFT BLANK

---

[50] *Id*. at 3.
[51] *Id*.
[52] Jackler Testimony at 8.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**





(Source: Kathleen Chaykowski, The Disturbing Focus of Juul's Early Marketing Campaigns, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketingcampaigns/#3da1e11b14f9).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

48.     JUUL knew these images would be successful in achieving the intended result because it intentionally crafted them to mimic specific traditional tobacco advertisements that Big Tobacco had used to target teens. In fact, many of JUUL's ads are nearly identical to old cigarette ads that were designed to get teens to smoke. Like its Big Tobacco predecessors, the focus of JUUL's initial marketing was on colorful ad campaigns using eye-catching designs and youth-oriented imagery with themes of being cool, carefree, stylish, attractive, sexy and popular—unusual themes and images if one's objective is to promote an adult-only smoking cessation device.[53]



THIS SPACE INTENTIONALLY LEFT BLANK

---

[53] Virginia Slims vs Juul Advertisement, Stanford U. Res. into the Impact of Tobacco Advert. (2015), http://tobacco.stanford.edu/tobacco_main/imagescomp.php?token2=fm_tn_st328.php&token1=fm_tn_img10799.php&theme_file=fm_tn_mt035.php&theme_name=Cigs%20vs.%20eCigs&subtheme_name=Cigs%20vs%20eCigs%20JUUL.



THIS SPACE INTENTIONALLY LEFT BLANK

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL





(Source: Julia Belluz, The Vape Company Juul Said It Doesn't Target Teens. Its Early Ads Tell a Different Story, Vox (Jan. 25, 2019), https://www.vox.com/2019/1/25/18194953/vape-juul-e-cigarette-marketing.)

49. JUUL used Big Tobacco's effective advertising imagery, but coupled it with a modern, state-of-the-art marketing campaign designed to target youth. It relied heavily on social media, crafting a powerful online presence, which persists even after JUUL deleted its accounts in the face of mounting public scrutiny. JUUL was particularly active on Instagram, which is the most

popular social media site among teens.[54] JUUL cultivated hashtags, allowing it to blend its ads in with wide range of user content, increasing exposure while concealing the commercial nature of the content.[55] JUUL then used hashtags to reinforce the themes it crafted in its product design, like #style, #technology, #smart, and #gadget. JUUL's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.[56]

50.     Even after JUUL halted its own social media posts in November 2018, viral peer-to-peer promotion among teens insured continued corporate and product visibility among young people.[57] In fact, community posts about JUUL increased after JUUL itself quit social media in the Fall of 2018. Prior to November 2018, over a quarter of a million posts appeared. In the eight months after JUUL halted its promotional postings, the rate of community postings increased significantly, resulting in the number of posts doubling to over half a million.[58]

51.     JUUL also paid social media influencers to post photos of themselves with JUUL devices and to use the hashtags that it was cultivating.[59] JUUL entered a contract with an advertising agency specifically to identify and recruit social media influencers that had at least 30,000 followers to, according to an internal JUUL email, "establish a network of creatives to leverage as loyalists" for the JUUL brand.[60] One such influencer was Christina Zayas, whom JUUL paid $1,000 for just one blog post and one Instagram post in the Fall of 2017.

---

[54] Jackler et al.
[55] *Id*. at 23.
[56] Jackler Testimony at 10.
[57] *Id*. at 11.
[58] *Id*.
[59] Jackler et al.
[60] Kenrick Cai, Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges, Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#1ea8bcdf33e2 .

52.     JUUL instituted an "affiliate program" to recruit those who authored favorable reviews of its products by providing such reviewers with a 20% discount of purchases of JUUL products.[61] It even recruited JUUL users to act as part of their marketing team by asking users to "refer a friend and get a discount."[62]

53.     Such tactics masked JUUL advertisements as user content, further increasing exposure and ultimately solidifying the company in teen pop culture as a form of cultural currency. JUUL's strategy was so successful in embedding its products into pop culture that it entered the vernacular as a verb. The JUUL device and the term "juuling" are so pervasive that JUUL effectively eliminated not only competitors, but also any potentially alarming terms like "smoking" or "e-cigarette," which could alert users to the true nature of the device or activity. A recent study found that 63% of adolescent JUUL users did not know that JUULpods contain nicotine.[63] This has worked to JUUL's advantage and was a deliberate part of its strategy. In the first year after its launch, not one of JUUL's 171 promotional emails said anything about nicotine content,[64] and it did not include nicotine warnings on the JUUL packaging until August 2018, only after it was forced to do so.

54.     The design of JUUL's product is also acutely attractive to youth. Unlike most of its predecessors, JUUL looks nothing like a cigarette. Instead, JUUL is sleek and linear and seems like the latest tech invention. This is not surprising, given the founders' Silicon Valley product design education and training. JUUL co-founder Adam Bowen drew on his experience as a design engineer at Apple to make JUUL's design mimic technology children were already familiar with, like

---

[61] Jackler Testimony 9-10.

[62] *Id*. at 9.

[63] Juul e-Cigarettes Gain Popularity Among youth, But Awareness of Nicotine Presence Remains Low, Truth Initiative (Apr. 18, 2018), https://truthinitiative.org/sites/default/files/media/files/2019/03/JUUL-E-cigarettesGain-Popularity-Among-Youth-But-Awareness-of-Nicotine-Presence-Remains-Low.pdf .

[64] Jackler et al. at 25.

Apple's iPhone.[65] This made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[66] The evocation of technology makes the JUUL device familiar and desirable to the younger, tech-savvy generation, particularly teenagers. According to 19-year-old Michelle Williams, "our Grandma's have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it." 15-year-old Sam Friedman agrees: "The tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[67]

55.     The JUUL device even has features reminiscent of youth-oriented tech culture and gaming, like "secret" features users can unlock, such as making the indicator light flash rainbow colors in "party mode." JUUL has been so successful in emulating technology that the small, rectangular devices are often mistaken for—or passed off as—flash drives.

56.     The ability to conceal a JUUL is also part of the appeal for adolescents. The devices are small and slim, so they fit easily in a closed hand or a pocket. The ease and simplicity of use—there is nothing to light or unwrap, or even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools. Finding new ways to hide the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that

---

[65] How JUUL made nicotine go viral, Vox (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok .
[66] *Id.*
[67] *Id.*

allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[68]

57.    JUUL also created special flavors that make its addictive, high-tech device even more attractive to adolescents. Tobacco companies have known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson memorandum: "Youth Cigarette – New Concepts," specifically noted the "well known fact that teenagers like sweet products."[69] According to 2004 data, 17-year-old smokers were more than three times likely as those over 25 to smoke flavored cigarettes and viewed flavored cigarettes as safer.[70] For this reason, in 2009 the FDA banned flavored cigarettes pursuant to its new authority under the Family Smoking Prevention and Tobacco Control Act of 2009. In announcing the ban, FDA Commissioner Dr. Margaret Hamburg declared that "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[71]

58.    There is no reason to believe that flavors play any different role with respect to e-cigarettes and youth. In fact, a 2017 study of the cigarette flavor ban found that the ban was effective in lowering the number of smokers and the amount smoked by smokers, though it was associated with an increased use of menthol cigarettes (the only flavor still available).[72] According to the

---

[68] Evie Blad, 'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know, Educ. Wk. (July 18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.
[69] Marketing Innovations, Inc., Brown & Williamson Tobacco Corp. Project Report: Youth Cigarette—New Concepts, U.C.S.F. Truth Tobacco Industry Documents (Sept. 1972), **Error! Hyperlink reference not valid.**.
[70] Gardiner Harris, Flavors Banned From Cigarettes to Deter Youth, N.Y. Times (Sept. 22, 2009) https://www.nytimes.com/2009/09/23/health/policy/23fda.html.
[71] *Id.*
[72] Charles J. Courtemanche et al., Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use, American Journal of Preventive Medicine 52(5):e139 - e146 (2017), https://tobacco.ucsf.edu/more-evidence-supporteliminating-flavors-reduce-youth-cigarette-and-e-cigarette-use; MB. Harrell, et al., Flavored e-cigarette use: Characterizing youth, young adult, and adult users, Prev Med Rep. 2017; 5: 33–40 (Nov. 11, 2016), doi: 10.1016/j.pmedr.2016.11.001 PMCID: PMC5121224.

25

Surgeon General, 85% of adolescents who use e-cigarettes use flavored varieties.[73] Studies also show that flavors motivate e-cigarette initiation among youth,[74] and that youth are much more likely to use flavored tobacco products than adults are.[75] Despite JUUL's claims that its target market is adult smokers, JUUL sold its product in flavors like Cool Mint, Crème Brulee, Fruit Medley, Cucumber, and Mango. These flavors were the reason countless adolescents started using JUUL products.

59.     The flavors pose dangers beyond luring young people into trying nicotine. Studies now show these sweet and fruity flavors present distinct additional health hazards. Researchers have found that some of the chemicals JUUL uses for flavor and perfume contain relatively high levels of acetals. Acetals are airway-irritating chemicals that may cause lung damage. Dr. Robert Jackler said that test results have shown that JUUL's sweet and fruity flavors "contribute[] to the increasing body of evidence documenting toxicological effects of e-cig vapor."[76]

60.     It is clear that JUUL targeted youth as a key business demographic. A recent study showed that 15 through 17-year-olds are 16 times more likely to use JUUL than 25-34 year olds. [77]

61.     JUUL was well aware from the beginning that its products would appeal to youth. A former JUUL manager, who spoke to The New York Times on the condition that his name not be

---

[73] E-Cigarette Use Among Youth and Young Adults, U.S. Dept. of Health and Human Services (2016), https://e-cigarettes.surgeongeneral.gov/documents/2016_sgr_full_report_non-508.pdf   (accessed Oct. 22, 2019).
[74] Karl Paul, Flavored Vapes Lure Teens Into Smoking and Nicotine Addiction, Study Shows, MarketWatch (Feb. 26, 2019), https://www.marketwatch.com/story/flavored-vapes-lure-teens-into-smoking-and-nicotine-addictionstudy-shows-2019-02-25.
[75] A.C. Villanti et al., Flavored Tobacco Product Use in Youth and Adults: Findings From the First Wave of the PATH Study, 53 Am. J. of Preventative Med. 139 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28318902.
[76] Susie Neilson, Irritating Compounds Can Show Up in 'Vape Juice', NPR (July 30, 2019), https://www.npr.org/sections/health-shots/2019/07/30/746238009/irritating-compounds-discovered-in-vapejuice.
[77] D.M. Vallone et al., Prevalence and correlates of Juul use among a national sample of youth and young adults, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

used because he worried about facing retribution from the company, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes 10 or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[78]

62.     This "suspicion" has been confirmed by the U.S. Surgeon General, who found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18 years old.[79]

63.     By the fall of 2018, JUUL was under intense scrutiny. A group of eleven United States senators wrote JUUL's CEO, Kevin Burns, a letter in April 2018, declaring that the JUUL device and JUULpods "are undermining our nation's efforts to reduce tobacco use among youth and putting an entire new generation of children at risk of nicotine addiction and other health consequences."[80] Less than a week later, then FDA Commissioner Gottlieb announced a crackdown on retailers to limit youth access to e-cigarettes and enforcement actions against JUUL in particular.[81] At the same time, the FDA sent JUUL a request for documents relating to marketing,

---

[78] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'? N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[79] Adams, supra note 2.

[80] Richard Durbin et al., Letter from 11 U.S. Senators, to Kevin Burns, CEO of JUUL Labs, Inc., United States Senate (April 18, 2018), https://www.durbin.senate.gov/imo/media/doc/JUUL%20Letter%20-%20S%20IGNED.pdf.

[81] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes, U.S. Food and Drug Admin. (April 23, 2018), https://www.fda.gov/news-events/press-announcements/statement-fdacommissioner-scott-gottlieb-md-new-enforcement-actions-andyouthtobaccoprevention?utm_campaign=04242018_StatementYouth%20Tobacco%Prevention&utm_medium=email&utm_source=Eloqua.

product design, and public health impact.[82] In July 2018, Massachusetts Attorney General Maura Healey announced an investigation into JUUL regarding marketing and sale to minors.[83] In September 2018, FDA Commissioner Gottlieb called youth vaping an "epidemic" and sent letters to JUUL and other e-cigarette manufacturers demanding a plan to reduce youth use.[84] Then, in October 2018, as alleged above, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to JUUL's sales and marketing practices.[85]

64.     On June 23, 2022 the FDA ordered Juul to remove its products from the US market, citing among other factors, concerns about the product's health risks and how their availability has played a "disproportionate role in the rise in youth vaping."[86]

## C. **Addictive By Design**

65.     In addition to designing its devices to be particularly attractive to youth, JUUL designed its devices to be highly addictive. Unlike most other e-cigarettes, which use freebase nicotine, JUUL uses patented nicotine salts from which it makes liquid nicotine cartridges, or JUULpods.[87] Each JUULpod is, according to the Company, the equivalent of a pack of cigarettes. Each pod contains an alarming amount of nicotine, with up to 59 mg per ml—an amount that is roughly three times the amount of nicotine that can be sold to consumers in the European Union in

---

[82] *Id.*

[83] AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors, Mass.gov (July 24, 2018), https://www.mass.gov/news/ag-healey-announces-investigation-into-juulother-online-e-cigarette-retailers-over-marketing.

[84] Letters to Manufacturers Regarding Plans to Address Youth Access and Use, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/ctp-letters-industry#youthaccess.

[85] McGinley, supra note 17.

[86] FDA Denies Authorization to Market JUUL Products, U.S. Food and Drug Admin. (June 23, 2022), https://www.fda.gov/news-events/press-announcements/fda-denies-authorization-market-juul-products

[87] Rachel Becker, Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electroniccigarettes-myblu-vuse-markten

28

a JUULpod. On top of ramping up the amount of nicotine, JUULpods enabled the Company to increase the rate and amount of nicotine delivery to the JUUL user, roughly doubling the concentration and tripling the delivery speed of nicotine of the average e-cigarette.[88]

66.     Big Tobacco spent decades manipulating nicotine in order to foster and maintain addiction in their customers. RJR developed and patented nicotine salt additives, including nicotine benzoate, to increase nicotine delivery in cigarette smoke. The objective was to provide an additional "nicotine kick" based on increased nicotine absorption associated with lower pH. JUUL uses this very same concept for its market-dominating e-cigarettes. The Company's patent for its nicotine salts describes a process for combining benzoic acids with nicotine, a formulation that mimics the nicotine salt additive developed by RJR. JUUL's use of benzoic acid and manipulation of pH affect the palatability of nicotine inhalation by reducing the "throat hit" that users experience when vaping. Indeed, this was the objective behind using nicotine salts (as compared to "free base nicotine" which has a higher pH). According to Ari Atkins, one of the inventors of the JUUL device, "[i]n the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it . . . I've got to choose my words carefully here: Appropriate for inhalation."[89]

67.     Because smokers are already accustomed to a certain level of harshness and throat hit, developing a product with low levels of harshness and minimal "throat hit" is only a critical concern if your goal is to appeal to non-smokers, and specifically, young people. Minimizing the harshness of nicotine also allows one to vape more frequently and for longer periods of time and masks the amount of nicotine being delivered by eliminating the unpleasant throat hit normally

---

[88]  How Much Nicotine is In Juul?, Truth Initiative (Feb. 26, 2019), https://truthinitiative.org/researchresources/emerging-tobacco-products/how-much-nicotine-juul

[89]  David Pierce, This Might Just Be the First Great E-Cig, Wired.com (Apr. 21, 2015), https://www.wired.com/2015/04/pax-juul-ecig/.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

associated with large doses of nicotine. The harshness of free base nicotine makes prolonged vaping difficult; the use of nicotine salts solves that problem. Put another way, the nicotine salt technology behind JUULpods makes JUUL "smoke" highly potent yet hardly perceptible.

68.     The increased nicotine exposure facilitated by the JUUL device has serious health consequences. The ease of use and "smoothness" strip away external inhibitors and enable extreme levels of unfettered use. Using the JUUL's own calculations, consuming two JUULpods in a day is the equivalent of consuming two to four packs of cigarettes a day. In this way, JUUL has not only created a new generation of e-cigarette smokers, but has also pioneered a new style of smoking—vaping—that is more nicotine-saturated than ever before.

69.     Increased rates and duration of smoking lead to greater overall exposure to nicotine. Nicotine is a neurotoxin. A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[90] Animal researchers from the Yale University School of Medicine has found that vaping during adolescence can lead to long-term brain changes, like attention deficit hyperactivity disorder.[91]

70.     Studies also show that exposure to nicotine as a teen—even minimal exposure—biologically primes the brain for addiction and greatly increases likelihood of dependence on

---

[90] N.A. Goriounova & H.D. Mansvelder, Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function, Cold Spring Harbor Persp. in Med. 2(12) (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.
[91] Jon Hamilton, How Vaping Nicotine Can Affect A Teenage Brain, NPR (Oct. 10, 2019), https://www.npr.org/sections/health-shots/2019/10/10/768588170/how-vaping-nicotine-can-affect-a-teenage-brain.

nicotine as well as other substances later in life.[92] In a study done on mice, even "very brief, low-dose exposure to nicotine in early adolescence increases the rewarding properties of other drugs, including alcohol, cocaine, methamphetamine—and these are long-term changes."[93]

71.     JUUL's use of flavors only amplifies its addictive qualities. Research done by Nii Addy, associate professor of psychiatry and cellular and molecular physiology at the Yale School of Medicine, found that "sweet flavors can make the nicotine more palatable . . . but also act in the brain to increase nicotine taking."[94] This effective is especially troubling for teenage brains, which are more sensitive than adult brains to rewards. According to University of Pennsylvania psychologist Janet Audrain-McGovern, research shows that "if the first e-cigarette you used was flavored, then you're more likely to go on and use an e-cigarette again."[95]

72.     According to congressional testimony from Dr. Jonathan Winickoff, a professor of pediatrics at Harvard Medical School and the Director of Pediatric Research in the Tobacco Research and Treatment Center, "[n]icotine addiction can take hold in only a few days, especially in the developing adolescent brain that is particularly vulnerable to addiction to nicotine. . . Many of my patients find Juul nearly impossible to stop. Nicotine withdrawal can cause headaches, insomnia, irritability, anxiety, and depression, and these withdrawal symptoms are one of the primary reasons a nicotine addiction is difficult to overcome." Moreover, there is a lack of effective tools to help adolescents overcome nicotine addiction: there is no good data on how to treat adolescents with e-cigarette dependence; there has not been enough research on youth tobacco

---

[92] National Institute on Drug Abuse, Principles of Adolescent Substance Use Disorder: A Research Based Guide (2014), https://www.drugabuse.gov/publications/principles-adolescent-substance-use-disorder-treatmentresearch-based-guide/introduction .
[93] Hamilton, supra note 92.
[94] Id.
[95] Id.

cessation strategies; and most of the pharmacological therapies approved for adults have been shown to be ineffective or only marginally effective in adolescents.[96]

73.     Research in Massachusetts indicates that daily JUUL and other e-cigarette use is much more likely to continue than daily cigarette smoking. Out of the surveyed students who reported ever using cigarettes, only 17% indicated that they remained daily smokers. Out of the surveyed students who reported ever using e-cigarettes daily, 58% remained daily users. This data demonstrates both that e-cigarette use in teens is very persistent, a result consistent with the addictiveness of JUUL and the difficulty teens have in trying to quit.[97]

74.     E-cigarette use also puts adolescents at increased risk for cigarette smoking. Compared to adolescents who do not use e-cigarettes, those who do are 3.5 times more likely to begin smoking cigarettes.

75.     The dangerous and destructive nature of nicotine is not a recent discovery. As a key ingredient in tobacco products, the drug and its deleterious effects have been the subject of scientific research and public health warnings for decades. Nicotine causes cardiovascular, reproductive, and immunosuppressive problems with devastating effects. Part of the reason the national decline in cigarette use in recent years was such a victory for public health was because there was a corresponding decline in teen exposure to nicotine. From 2000 to 2017, the smoking rate among high school students fell by 73%.[98]

---

[96] Jonathan Winickoff, Testimony of Jonathan Winickoff before the U.S. House of Representatives Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf at 2 ("Winickoff Testimony").
[97] Id.
[98] Matthew L. Myers, Press Release: On 20th Anniversary of State Tobacco Settlement (the MSA), It's Time for Bold Action to Finish the Fight Against Tobacco, Campaign for Tobacco-Free Kids (Nov. 26, 2018), https://www.tobaccofreekids.org/press-releases/2018_11_26_msa20.

76.     That trend has completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[99] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[100] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[101] This drastic reversal caused the CDC to describe youth vaping an "epidemic."[102]

77.     The teen vaping epidemic, of which JUUL is the architect, has and will continue to have significant costs, both for individual users and for society. Nicotine addiction alone has significant health care costs, and these costs are exacerbated when adolescents are involved. Adolescent nicotine addiction leads to memory and attention problems, and increase chances of addiction later in life, all of which will continue to have long-lasting impacts on society.

78.     Science is also beginning to show that e-cigarettes have the potential to cause even more, distinct health risks and costs. The very same liquids that enable e-cigarettes to deliver nicotine with such potency are proving to be increasingly dangerous. When heated, the vape liquid turns into aerosol, which may contain, in addition to nicotine, ultrafine toxic particles such as lead,

---

[99] Progress Erased: Youth Tobacco Use Increased During 2017-2018, Ctrs. for Disease Control and Prevention (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.
[100] Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason, Ctrs. for Disease Control & Prevention (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.
[101] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes, U.S. Food & Drug Admin. (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scottgottlieb-md-proposed-new-steps-protect-youth-preventing-access.
[102] Adams, supra note 2.

additional chemicals, and volatile organic compounds.[103] These chemicals have the potential to be deadly. Vaping is now linked to conditions like chronic obstructive pulmonary disease and seizures, and there were 193 possible cases of severe lung illness associated with e-cigarette product use in 22 states in less than two months in the summer of 2019 alone.[104] Public health officials reported the first known death from a vaping-related illness on August 23, 2019.[105] On September 11, 2019, a teenager in King County became the first person in Washington State to be diagnosed with a severe lung disease associated with vaping.[106] By October 10, 2019, lung illness tied to vaping had killed 26 people, and there were over 1,300 possible cases of serious illness reported from 49 states.[107] Only Alaska has not yet seen a case. 16% of these patients have been under the age of 18.[108] In October 2019, a 17-year-old boy from the Bronx, New York, became the first child to die from vaping-related respiratory illness.[109]

---

[103] Lena H. Sun, He went from hiking enthusiast to 'on death's door' within days. Doctors blamed vaping, Wash. Post (Aug. 24, 2019), https://www.washingtonpost.com/health/one-mans-near-death-experience-with-vapingrelated-lung-failure/2019/08/24/ca8ce42c-c5b4-11e9-9986-1fb3e4397be4_story.html?arc404=true.

[104] CDC, FDA, States Continue to Investigate Severe Pulmonary Disease Among People Who Use E-cigarettes, Ctrs. for Disease Control & Prevention (Aug. 21, 2019), https://www.cdc.gov/media/releases/2019/s0821-cdc-fdastates-e-cigarettes.html .

[105] Matt Richtel & Sheila Kaplan, First Death in a Spate of Vaping Sicknesses Reported by Health Officials, N.Y. Times (Aug. 23, 2019), https://www.nytimes.com/2019/08/23/health/vaping-death-cdc.html.

[106] Nicole Brodeur & Ryan Blethen, King County teen is first in state diagnosed with severe lung disease related to vaping, Seattle Times (Sept. 11, 2019), https://www.seattletimes.com/seattle-news/health/king-county-teen-isfirst-in-state-diagnosed-with-severe-lung-disease-related-to-vaping/.

[107] Nicole Brodeur & Ryan Blethen, King County teen is first in state diagnosed with severe lung disease related to vaping, Seattle Times (Sept. 11, 2019), https://www.seattletimes.com/seattle-news/health/king-county-teen-isfirst-in-state-diagnosed-with-severe-lung-disease-related-to-vaping/.

[108] Denise Grady, Vaping Illnesses Top 1,000, C.D.C., N.Y. Times (Oct. 3, 2019), https://www.nytimes.com/2019/10/03/health/vaping-illnesses-cdc.html.

[109] Ed Shanahan and Azi Paybarah, Bronx Teenager's Death Is the Youngest Vaping Fatality in U.S., N.Y. TIMES (Oct. 8, 2019), https://www.nytimes.com/2019/10/08/nyregion/vaping-death.html.

34

1
2
3
4
5
6
7
8
9
10
11



12      79.    Many                                                                teenagers    are

simply unaware of these risks, an ignorance that JUUL preys on. According to Dr. Winickoff, many

of his patients believe JUULing is harmless:

> Counseling teens and preteens on e-cigarette use is challenging. Many of my patients
> have wildly incorrect beliefs about e-cigarettes. They know that cigarettes are
> dangerous, but assume that Juul—since it's ubiquitous, comes in child friendly flavors,
> and is marketed as a healthier alternative to smoking—must be harmless. I have to
> explain to kids that e-cigarettes do not have the same positive health benefits as the fruits
> whose flavor they copy. Even the term vapor calls to mind harmless water vapor. There
> is no water in these products.

Winickoff Testimony at 1.

        80.    In a clear admission of responsibility, JUUL's former CEO Kevin Burns has

apologized to all the parents for the vaping epidemic. Mr. Burns said, "I'd tell [the parents] that I'm

sorry that their child's using the product." After this apology and in response to the growing number

of vape-related health incidences and the threats of legal action, JUUL replaced Mr. Burns with

K.C. Crosthwaite. Mr. Crosthwaite was the chief growth officer at Altria, the makers of Marlboro

cigarettes. Replacing Mr. Burns with a "growth executive" from Big Tobacco is a clear sign that JUUL does not plan to stop its obsession with growth regardless of public health impacts.

### D. **JUUL and School**

81.     In addition to severe health consequences, widespread "JUULing" has placed severe burdens on society, and school districts in particular. It is not an overstatement to say that JUUL has changed the educational experience of students across the United States.

///

///

///

///

///

82.     JUUL use has invaded school bathrooms—now known as "the Juul room."[110] As one high school student explained, "it's just a cloud."[111] The ubiquity of JUUL use in high



---

[110] Moriah Balingit, In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools, Wash. Post (July 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-the-drawof-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a11e9-933d-7501070ee669_story.html.

[111] Greta Jochem, Juuling in School: e-Cigarette Use Prevalent Among Local Youth, Daily Hampshire Gazette (Nov. 13, 2018), https://www.gazettenet.com/Juuling-in-Schools-21439655.

school bathrooms has generated numerous online spoofs about "the juul room."[112]

83.     Kids have also coined the term "nic sick"—which, as one high school student explained to CBS News, "kinda seems like a really bad flu, like, just out of nowhere. Your face goes pale, you start throwing up and stuff, and you just feel horrible."[113]

84.     Such rampant JUUL use has effectively added another category to teachers' and school administrators' job descriptions; many now receive special training to respond to the various problems that JUUL use presents, both in and out of the classroom. A national survey of middle schools and high schools found that 43.3% of schools have had to implement not only an e-cigarette policy but a JUUL-specific policy. Participants in the survey reported multiple barriers to enforcing these policies, including the discreet appearance of the product, difficulty pinpointing the vapor or scent, and the addictive nature of the product.[114]

85.     Across the United States, schools have had to divert resources and administrators have had to go to extreme lengths to respond to the ever-growing number of students using JUULs on school grounds. According to the Truth Initiative, more than 40 percent of all teachers and administrators reported that their school uses camera surveillance near the school's restroom, almost half (46 percent) reported camera surveillance elsewhere in the school, and 23 percent reported

---

[112]    Juul Hashtag Meme, Stanford U. Res. into the Impact of Tobacco Advert. (2018), http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st681.php&token1=fm_pods_im%20g37610.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=%23juul.

[113]    High school students say about 20% of their peers are vaping, some as young as 8th grade, CBS News (Aug. 31, 2019), https://www.cbsnews.com/news/high-school-students-say-about-20-of-their-peers-are-vaping-some-asyoung-as-8th-grade/.

[114]    Barbara A. Schillo, et al., JUUL in School: Teacher and Administrator Awareness and Policies of E-Cigarettes and JUUL in U.S. Middle and High Schools, Truth Initiative (Sep. 2019), https://journals.sagepub.com/doi/full/10.1177/1524839919868222?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed.

using assigned teachers for restroom surveillance.[115] Some schools have responded by removing bathroom doors or even shutting bathrooms down,[116] and schools have banned flash drives to avoid any confusion between flash drives and JUULs.[117] Schools have also paid thousands of dollars to install special monitors to detect vaping, which they say is a small price to pay compared to the plumbing repairs otherwise spent as a result of students flushing vaping paraphernalia down toilets.[118] Other school districts have sought to create new positions for tobacco prevention supervisors, who get phone alerts when vape smoke is detected in bathrooms.[119]

86.     Many schools have shifted their disciplinary policies in order to effectively address the JUUL epidemic. Rather than immediately suspending students for a first offense, school districts have created anti-vaping curricula which students are required to follow in sessions held outside of normal school hours, including on Saturdays.[120] Teachers prepare lessons and study materials for these sessions with information on the marketing and health dangers of vaping[121]—extra work

---

[115] How are schools responding to JUUL and the youth e-cigarette epidemic?, Truth Initiative, (Jan. 18, 2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/how-are-schools-responding-juul-andyouth-e-cigarette.

[116] Ana B. Ibarra, The Juul's So Cool, Kids Smoke It In School, Kaiser Health News (Mar. 26, 2018), https://khn.org/news/the-juuls-so-cool-kids-smoke-it-in-school/; Evie Blad, 'Juuling' Craze: Schools Scramble to Deal With Student Vaping, Educ. Wk. (May 4, 2018), https://www.edweek.org/ew/articles/2018/05/09/juuling-craze-schools-scramble-to-deal-with.html.

[117] Ana B. Ibarra, Why 'juuling' has become a nightmare for school administrators, Kaiser Health News (Mar. 26, 2018), https://www.nbcnews.com/health/kids-health/why-juuling-has-become-nightmare-school-administratorsn860106.

[118] Suzanne Monaghan, Many schools installing vape detectors in bathrooms to discourage e-cigarette use, KYW Newsradio (June 10, 2019), https://kywnewsradio.radio.com/articles/news/many-schools-installing-vapedetectors-bathrooms-address-rise-e-cigarette-use.

[119] Lauren Katims, California Fights Vaping in Schools, U.S. News & World Report (Apr. 30, 2019), https://www.usnews.com/news/best-states/articles/2019-04-30/california-focuses-on-education-to-curb-vaping-in-schools.

[120] Id.

[121] Pat Eaton-Robb, Discipline or treatment? Schools rethinking vaping response, Concord Monitor (May 26, 2019), https://www.concordmonitor.com/Discipline-or-treatment-Schools-rethinking-vaping-response-25822972.

which requires teachers to work atypical hours early in the mornings and on weekends.[122] Some schools will increase their drug-testing budget to include random nicotine tests for students before they join extracurricular activities. Under this drug testing protocol, first offenders will undergo drug and alcohol educational programming; second and third offenders with be forced to sit out from extracurriculars and attend substance abuse counseling.[123]

87.   JUUL actively sought to enter school campuses. The Subcommittee on Economic and Consumer Policy ("Subcommittee") conducted a months-long investigation of JUUL, including reviewing tens of thousands of internal documents, and concluded that JUUL "deliberately targeted children in order to become the nation's largest seller of e-cigarettes."[124] The Subcommittee found that "(1) Juul deployed a sophisticated program to enter schools and convey its messaging directly to teenage children; (2) Juul also targeted teenagers and children, as young as eight years-old, in summer camps and public out-of-school programs; and (3) Juul recruited thousands of online "influencers" to market to teens."[125]

88.   According to the Subcommittee, JUUL was willing to pay schools and organizations hundreds of thousands of dollars to have more direct access to kids. Such attempts included paying a Baltimore charter school organization $134,000 to start a summer camp to teach kids healthy lifestyles, for which JUUL itself would provide the curriculum; offering schools $10,000 to talk to students on campus; and giving the Police Activities League in Richmond, California, $90,000 to

---

[122] Kathy Brown, School trustees OK discipline for juuling/vaping offenses, Gillette News Record (Aug. 29, 2019), https://www.gillettenewsrecord.com/news/local/article_5ec28c96-fd48-5ae0-b2674e417272d020.html.
[123] Christine Hauser, This School District Has a Way to Combat Vaping: Random Nicotine Tests, N.Y. Times (June 17, 2019), https://www.nytimes.com/2019/06/17/us/nebraska-vaping-schools.html.
[124] Supplemental Memorandum for Hearing on 'Examining JUUL's Role in the Youth Nicotine Epidemic: Parts I & II' from Committee Staff, to Democratic Members of the Subcommittee on Economic and Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/_democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.  (hereinafter "JUUL's Role in Youth Nicotine Epidemic").
[125] Id.

provide JUUL's own vaping education program, "Moving On," to teenage students suspended for using cigarettes.[126] Meanwhile, JUUL would collect data about test scores, surveys, and activity logs about the students.

89.    Among the more egregious incidents reported by the Subcommittee was a July 24, 2019 presentation -- during which no parents or teachers were in the room – which conveyed the message that the JUUL product was "totally safe," and the presenter even demonstrated to the students how to use a JUUL.[127] The school was presumably paid for this meeting, which was marketed to the school as an anti-smoking initiative. A JUUL spokesman said JUUL is no longer funding such programs.[128]

E.    **Impact on Rocky Point Union Free School District**

90.    The epidemic has severely impacted the District. JUUL use has interrupted the educational environment – and is impeding learning – in schools throughout the District. The District has suffered at least four types of harm.

91.    *First*, the surge of vaping disrupts the learning environment as educators have to deal with the prevention and detection of student vaping and modify school property and school operations in response to the problem. With respect to students who are caught vaping, administrators must expend time and resources to deal with the problem and provide supports (e.g., positive behavioral interventions). In addition, bathrooms cannot be utilized as designed due to the high incidence of bathroom vaping. As another example, because standard smoke detectors are not sufficiently sensitive to detect vape smoke and interferes with fire alarm detectors, the District

---

[126] Sheila Kaplan, Juul Targeted Schools and Youth Camps, House Panel on Vaping Claims, N.Y. Times (July 25, 2019), https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.
[127] JUUL's Role in Youth Nicotine Epidemic, supra note 125.
[128] *Id.*

would need to retrofit its detector systems or procure vaping detectors to fully monitor and prevent in-school vaping on middle school and high school campuses.

92.     *Second*, the vaping epidemic hurts individual student learning. Vaping has led to a rise in student absences due to sickness or absenteeism. Research shows that students who attend school more often do better in school.[129] In Massachusetts, the National Bureau of Economic Research found "poor attendance can account for up to a quarter of the math achievement gap between poor and non-poor students."[130] A study of Chicago Public Schools shows "course attendance is eight times more predictive of ninth grade failure than eighth grade test scores."[131] In sum, vaping-related school absences directly impact the academic achievement of the District's students.

93.     *Third*, vaping hurts all students in the District, not just those who do it, through less school funding from the State for school operations. The vast majority of revenue the District receives is tied to daily student attendance. Student absences due to vaping related issues cause a reduction in state funding for the District, which inherently results in a reduction in school-site staff for all students. The District receives funding from the State only if students attend school. The more vaping-related students absences from school, the less funding the District gets to spend on learning for all students.

94.     Fourth, vaping hurts all students by diverting funding away from learning toward educational campaigns, prevention, and treatment. For example, the District would divert services

---

[129]  Department of Education, 2013-14 Civil Rights Data Collection, https://www2.ed.gov/datastory/chronicabsenteeism.html#intro

[130] Joshua Goodman, "Flaking out: Student absences and snow days as disruptions of instructional time." No. w20221. National Bureau of Economic Research (2014).

[131] Elaine M. Allensworth, & John Q. Easton, "What Matters for Staying On-Track and Graduating in Chicago Public Highs Schools: A Close Look at Course Grades, Failures, and Attendance in the Freshman Year. Research Report." Consortium on Chicago School Research (2007).

41

and funding away from implementing specialized programs, lower class size, improved technology, enhanced curricular materials, and academic reading and math instructional intervention programs for students who are struggling academically. The District will continue to incur extensive costs to orchestrate outreach regarding the risks of vaping, to enforce restrictions regarding vaping in school (for example, through vape smoke detectors), and to develop and carry out protocol associated with the collection and disposal of vape products. In the absence of student vaping, these funds could have gone to the District's core activity – educating New York's youth.

### FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

95.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

96.     Defendants' design, manufacture, production, marketing, distribution, and sale of highly-addictive and harmful e-cigarettes and nicotine pods, when such actions were taken with the intent to market and, in fact, were marketed to youth through repeated misstatements and omissions of material fact, unreasonably interfered with a public right in that results of Defendants' actions created and maintained a condition dangerous to the public's health, was offensive to community moral standard, or unlawfully obstructed the public in free use of public property. Defendant intentionally created and maintained a public nuisance by, among other acts:

a.   Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens;

b.   Engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly

42

adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push JUUL products on JUUL's behalf, and by selling JUUL in flavors designed to appeal to youth;

c.  Engaging in advertising modeled on cigarette ads and featuring youthful appearing models and designing advertising in a patently youth-oriented fashion;

d.  Directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels;

e.  Hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media;

f.  Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products; and

g.  Promoting and assisting the growth of the JUUL market and its availability with knowledge that JUUL products were being purchased and used by large numbers of youth.

97.    The health and safety of the students and employees of Rocky Point Union Free School District, including those who use, have used, or will use JUUL products, as well as those affected by others' use of JUUL products, are matters of substantial public interest and of legitimate concern to the Plaintiffs students and employees, as well as to the entire Rocky Point, New York community.

98.    Defendants' conduct was continuous and occurred over a span of years. Defendants' conduct has affected and continues to affect a substantial number of people within Rocky Point Union Free School District and is likely to continue causing significant harm.

99.     But for Defendants' actions, JUUL use by minors would not be as widespread as it is today, and the vaping public health epidemic that currently exists as a result of the Defendants' conduct would have been averted.

100.     Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. Defendants knew or reasonably should have known that their statements regarding the risks and benefits of JUUL were false and misleading, that their marketing methods were designed to appeal to minors, and that their false and misleading statements, marketing to minors, and active efforts to increase the accessibility of JUUL products and grow JUUL's market share were causing harm to minors and to school districts, including minors in Rocky Point Union Free School District and the School District itself. Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the financial and economic losses incurred by Rocky Point Union Free School District.

101.     Alternatively, Defendants' conduct was a substantial factor in bringing about the public nuisance even if a similar result would have occurred without it. By directly marketing to youth and continuing marketing practices after it was evidence that children were using JUUL products in large numbers and were specifically using these products in school, JUUL directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting the School District. By investing billions of dollars in JUUL and actively working to promote the sale and spread of JUUL products with knowledge of JUUL practice of marketing its products to youth and failure to control youth access to its products, Altria directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting the School District.

102.     The public nuisance created and maintained by Defendants has resulted, and continues to result, in significant damage and annoyance to Plaintiff Again, the FDA and other shave

44

recognized that teen vaping is an epidemic and that Defendants' actions are at the heart of that epidemic.

103.    The injury suffered by Plaintiff is distinguishable from that suffered by the general public, both in kind and quality. Plaintiff, a school district, has incurred, and continues to incur, significant expenditures of time and resources to combat rampant use of Defendants' nicotine products by students, including during school. The significant time and resources necessary to combat this reality and maintain the safety of Plaintiff's students and achieve the educational goals of Plaintiff are unique from the hard suffered by the general public.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

104.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

105.    Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL e-cigarettes and JUULpods, which were intended by Defendant to be used as a method of vaping nicotine and the other aerosolized constituents of JUUL's nicotine solution.

106.    Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including students at Plaintiff's schools.

107.    As described herein, Defendant designed and marketed their products to appeal to

45

nonsmokers, youths and adolescents and to encourage them to buy and use the product. Because JUUL products deliver significantly more nicotine into a user's bloodstream than combustible cigarettes and contain more nicotine than JUUL represents, thereby posing an unnecessary risk of addiction and other severe health consequences, they are inherently defective. In addition, because JUUL products are made to create and sustain addiction, including through a quicker and more potent delivery system than Defendant represented and compared to any other nicotine vaping product, they are unreasonably dangerous and defective in design. The risks inherent in the design of JUUL products outweigh significantly any benefits of such design, including any benefit as an alternative to smoking combustible cigarettes.

108.    At all relevant times, Defendant could have employed reasonably feasible alternative designs to prevent the harms discussed herein.

109.    At all relevant times, Plaintiff and Plaintiff's students were unaware of the design defects described herein. Further, Defendant knew or had reason to know that youths and adolescents, including students who Defendant told their products were "totally safe," would not fully realize the dangerous and addictive nature of JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

110.    Plaintiff was harmed directly and proximately by Defendant's defectively designed JUUL e-cigarette and JUULpods. Such harm includes significant and ongoing nicotine abuse and addiction by students at Plaintiff's schools, which has necessitated and continues to necessitate significant steps to combat and prevent use of Defendant's products by students. Use of Defendant's products by students at Plaintiff's schools frustrates Plaintiff's ability to achieve its educational goals

and ensure the safety of Plaintiff's students which, again, has required and continues to require significant expenditures of Plaintiff's resources to address these conditions.

111.    The gravity of the harm resulting from Defendants' vaping products was, is, and will be enormous. Defendants have created an epidemic among young people that will take enormous resources, time, and effort to curb.

112.    Defendants knew that their vaping products could cause the type of harm suffered by Plaintiff.

113.    At all times, there have been safer alternative designs that were and are feasible, cost effective, and advantageous.

114.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others, and thus Defendants were and are grossly negligent.

115.    Defendants, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO WARN

116.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

117.    Defendant designed, manufactured, marketed, distributed, and sold JUUL ecigarettes and JUULpods, or has partnered to design, manufacture, market, distribute, and sell JUUL e-cigarettes and JUULpods.

118.   At all times relevant, Defendant was well-aware of the dangers of vaping and nicotine use, including use of JUUL's products, as described herein.

119.   At all times relevant, Plaintiff and students at Plaintiff's school were not aware of and would not have recognized the risks of using a JUUL e-cigarette with a JUULpod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks to users' mental and physical health from use of Defendant's products, including high-levels of nicotine exposure and nicotine addiction.

120.   In all forms of advertising, including but not limited to social media communications, Defendant failed to warn adequately or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harm caused by vaping JUULpods, including but not limited to nicotine exposure and addiction. Defendant failed to warn adequately in their advertising or anywhere on the product that the product was not safe for minors and, instead, posed serious immediate and long-term health risks, and should not be used or consumed by them. Rather, Defendant intentionally marketed their products to minors in youth-friendly colors and flavors. Defendant also designed their products to be more palatable to youth and nonsmokers by making JUUL e-cigarettes easier to inhale while increasing the level of nicotine that is absorbed by users, making them even more addictive.

121.   The defects in JUUL's products, including the lack of warnings or instructions, existed at the time the JUUL e-cigarettes and JUULpods were sold and/or when the JUUL e-cigarettes and JUULpods left JUUL's possession or control.

122.   JUUL's e-cigarettes and JUULpods were anticipated to be used by youth, including students, without substantial change in their condition from the time of their manufacture or sale.

123.   Plaintiff was harmed directly and proximately by Defendant's failure to warn. Such

harm includes significant and ongoing nicotine abuse and addiction by students at Plaintiff's schools, which has necessitated and continues to necessitate significant steps to combat and mitigate use of Defendant's products by students. Use of Defendant's products by students at Plaintiff's schools frustrates Plaintiff's ability to achieve its educational goals and ensure the safety of Plaintiff's students which, again, has required and continues to require significant expenditures of Plaintiff's resources to address these conditions.

124.    Defendants' failure to warn was intentional, willful, and malicious. The conduct was carried on with a conscious disregard for the safety and the rights of others, such as Plaintiff.

125.    As a proximate cause of Defendants' actions, Plaintiff has and will continue to incur substantial expense to address the vaping epidemic at its schools.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

126.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

127.    Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm.

128.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

129.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products. Defendants' duty of care owed

49

to consumers and the general public, including Plaintiff, included providing accurate, true, and correct information concerning the risks of using JUUL products and appropriate, complete, and accurate warnings concerning the potential adverse effects of vaping and nicotine use and, in particular, JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

130.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of JUUL products and specifically, the health hazards posed by vaping JUULpods and continued use of nicotine, particularly among adolescents.

131.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of JUUL e-cigarettes and JUULpods by students could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to Plaintiff.

132.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products including but not limited to the risk of continued nicotine use and nicotine addiction.

133.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its JUUL e-cigarettes and JUULpods, in that Defendants manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's use of the products created a

1  significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately

2  warn of these risks and injuries.

3       134.    Despite its ability and means to investigate, study, and test its products and to provide

4  adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed

5
   information and has further made false and/or misleading statements concerning the safety and/or

6
   use of JUUL products and nicotine vaping.

7

8       135.    Defendants negligence included:

9

10       a.  Manufacturing, producing, promoting, formulating, creating, developing, designing,
             selling, and/or distributing its JUUL products without thorough and adequate pre-
11           and post-market testing;

12       b.  Failing to undertake sufficient studies and conduct necessary tests to determine
             whether or not JUUL products were safe for their intended use;
13       c.  Failing to use reasonable and prudent care in the design, research, manufacture,
             formulation, and development of JUUL products so as to avoid the risk of serious
14           harm associated with the prevalent use of JUUL products and nicotine;

15
         d.  Failing to provide adequate instructions, guidelines, and safety precautions to those
16           persons who Defendants could reasonably foresee would use its JUUL products;

17
         e.  Failing to disclose to Plaintiff, users, consumers, and the general public that the use
18           of JUUL products presented severe health risks including nicotine addiction;

19       f.  Representing that its JUUL products were safe for their intended use  when, in fact,
20           Defendants knew or should have known that the products were not safe for their
             intended use;
21
         g.  Declining to make or propose any changes to JUUL products' labeling or other
22           promotional materials that would alert the consumers and the general public of the
23           true risks of JUUL products;

24       h.  Advertising, marketing, and recommending the use of JUUL products, while
             concealing and failing to disclose or warn of the dangers known by Defendants to
25           be associated with or caused by the use of JUUL products;

26
         i.  Continuing to disseminate information to its consumers, which indicates or implies
27           that Defendants' products are not unsafe for their intended use.; and

28

j.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

136.   Defendants knew and/or should have known that it was foreseeable that Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

137.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids by Plaintiff's students.

138.   Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

139.   Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of its products with full knowledge of the dangers of its products.

140.   Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Defendants' reckless conduct therefore warrants an award of aggravated or punitive damages.

141.   As a proximate result of Defendants' wrongful acts and omissions in placing its defective JUUL products into the stream of commerce without adequate warnings of their hazardous nature, Plaintiff has been injured and suffered economic damages and will continue to incur expenses in the future.

## FIFTH CAUSE OF ACTION

### GROSS NEGLIGENCE

142.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

143.   Defendants owed a duty of care to Plaintiff to conduct their business of manufacturing, promoting, marketing, and/or distributing JUUL nicotine products in compliance with applicable state law and in an appropriate manner.

144.   Specifically, Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not target minors; ensuring that JUUL e-cigarettes and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; adequately warning of any reasonably foreseeable adverse events with respect to using the product. Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL products into the stream of commerce, and therefore owed a duty of reasonable care to those, including Plaintiff, who would be impacted by its use.

145.   JUUL's products were the types of products that could endanger others if negligently made, promoted, or distributed. Defendants knew the risks that young people would be attracted to their e-cigarettes and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

146.   Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard minors from the sale and/or distribution of e-cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

147.   Defendants were negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling JUUL's products.

148.   As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew or should have known that JUUL's products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm. Defendants knew or should have known that their products could cause serious risk of harm, particularly to young persons like students in Plaintiffs schools.

149.   Defendants were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

150.   The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

   a.   Failure to perform adequate testing of the JUUL products prior to mark ting to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

   b.   Failure to take reasonable care in the design of JUUL's products;

   c.   Failure to use reasonable care in the production of JUUL's products;

   d.   Failure to use reasonable care in the manufacture of JUUL's products;

   e.   Failure to use reasonable care in the assembly of JUUL's products;

   f.   Failure to use reasonable care in supplying JUUL's products;

   g.   Failure to use reasonable care in distributing JUUL's products;

   h.   Failure to use reasonable care in advertising, promoting, and marketing JUUL's products;

i.   Promotion of JUUL's products to young people under age 26, and especially to minors;

j.   Use of flavors and design to appeal to young people under age 26, and especially to minors, in that the products smell good, look cool and are easy to conceal from parents and teachers;

k.   Use of design that maximizes nicotine delivery while minimizing "throat hit," thereby easily creating and sustaining addiction;

l.   Failure to prevent JUUL's products from being sold to young people under age 26, particularly to minors;

m.   Failure to prevent use of JUUL's products among young people under age 26, particularly for minors;

n.   Failure to curb use of JUUL's products among young people under age 26, particularly for minors;

o.   Failure to develop tools or support to help people addicted to JUUL's products cease using the products, including manufacturing lesser amounts of nicotine;

p.   Failure to reasonably and properly test and properly analyze the testing of JUUL's products under reasonably foreseeable circumstances;

q.   Failure to warn its customers about the dangers associated with use of JUUL's products, in that it was unsafe for anyone under age 26, significantly increases blood pressure, carries risks of stroke, heart attacks, and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

r.   Failure to instruct customers not to use the product if they were under 26, particularly minors, and failing to provide any instructions regarding a safe amount of JUULpods to consume in a day.

s.   Failure to ensure that JUUL's products would not be used by persons like Plaintiffs students who were not smokers and who were under age 26, particularly minors;

t.   Failure to warn customers that JUUL's had not adequately tested or researched JUUL products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

55

u.  Failure to utilize proper materials and components in the design of JUUL's products to ensure they would not deliver unsafe doses of nicotine;

v.  Failure to use due care under the circumstances;

w.  Failure to take necessary steps to modify JUUL's products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

x.  Failure to recall JUUL's products; and

y.  Failure to inspect JUUL's products for them to operate properly and avoid delivering unsafe levels of nicotine to young persons.

151.    Defendants breached the duties they owed to Plaintiff and in doing so, was wholly unreasonable. A responsible company, whose primary purpose is to help adult smokers, would not design a product to appeal to minors and nonsmokers nor market their products to minors and nonsmokers. If they are aware of the dangers of smoking and nicotine ingestion enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

152.    Defendants breached their duties through its false and misleading statements and omissions in the course of its manufacture, distribution, sale, and/or marketing of JUUL nicotine products within the State.

153.    As a foreseeable consequence of Defendants' breaches of their duties, Plaintiff suffered direct and consequential economic injuries as a result of dealing with the JUUL epidemic in Plaintiff's schools.

154.    Defendants' breaches of their duties involved an indifference to duty amounting to recklessness and actions outside the bounds of reason, so as to constitute gross negligence.

155.    Defendants' gross negligence was egregious, directed at the public generally, and involved a high degree of moral culpability.

## PUNITIVE DAMAGES ALLEGATION

156.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

157.    Defendants expressed a reckless indifference to the safety of users of JUUL e-cigarettes and pods, including students attending Plaintiff's schools. Defendants' conduct, as described herein, knowing the dangers and risks of JUUL e-cigarettes and pods, yet concealing and/or omitting this information in their advertising, in furtherance of their conspiracy and concerted action was outrageous because of Defendants' willful a reckless indifference to the safety of users of JUUL e-cigarettes and pods.

158.    Plaintiff is entitled to punitive damages because Defendants' failure to warn and other actions as described herein were malicious, wanton, willful or oppressive or were done with reckless indifference to the Plaintiff and the public's safety and welfare. Defendants misled both the FDA and the public at large, including the Plaintiff herein, by making false representations about the safety of their product. In their advertising, Defendants downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects associated with the use of their product, despite available information demonstrating that JUUL e-cigarettes and pods were likely to cause serious side effects.

159.    Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects. Nonetheless, they continued to advertise the products by providing false and misleading information with regard to safety and efficacy.

160.   Defendants' actions described above were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff and the public. As a direct and proximate result of the willful, wanton, evilly, motivated and/or reckless conduct of Defendants, Plaintiff sustained damages as set forth above. Accordingly, Plaintiff seeks and is entitled to punitive damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

    a.   Compensatory damages as allowable by law;

    b.   Costs to abate and/or mitigate the continuing nuisance;

    c.   Injunctive relief and abatement;

    d.   Punitive damages;

    e.   Reasonable attorneys' fees as allowed by law;

    f.   Statutory pre-judgment and post-judgment interest allowable by law;

    g.   Costs of this suit allowable by law; and,

    h.   Any and all other relief that this Court deems necessary and appropriate.

Dated: July 14, 2022

Nicholas R. Farnolo, Esq. (Admitted *Pro Hac Vice*)
**NAPOLI SHKOLNIK, PLLC**
400 Continental Boulevard, 6th Floor
El Segundo, CA 90245
T: (212) 397-1000
F: (646) 843-7619
NFarnolo@napolilaw.com

*Attorneys for Plaintiff*
*Rocky Point Union Free School District*